## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| **KELVIN W. HARRIS**, on behalf of himself and all others similarly situated, | |
| Plaintiff, | CASE NO. 2:14-cv-1231 |
| v. | JUDGE ALGENON L. MARBLEY |
| **EXEL, INC.** | Magistrate Judge Terence P. Kemp |
| Defendant. | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT FOR LACK OF STANDING

### I.    INTRODUCTION

Exel moves for summary judgment on the narrow claim that Plaintiff, Kelvin Harris, lacks standing. As has become increasingly frequent among class action defendants, Exel bases this motion on a complete misreading of the Supreme Court's decision in *Spokeo v. Robins*, 136 S. Ct. 1540, 194 L. Ed. 2d. 635 (2016). Despite Exel's intimations otherwise, the reality is that *Spokeo* broke no new ground. *See e.g.*, *LaVigne v. First Comm. Bancshares, Inc.*, No. 1:15-cv-00934, 2016 WL 4196812, at *3 (D.N.M. Oct. 19, 2016) ("In defining the 'concrete' part of an injury-in-fact, Spokeo did not break any new legal ground for case-and-controversy requirements.") The Court's consensus opinion simply reiterated that, to have standing, a plaintiff must show an injury that was both particularized and concrete. In doing so, the Court reaffirmed well-established Article III standing principles—that "intangible injuries can nevertheless be concrete," and that "[i]n determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Spokeo*, 136 S. Ct. at 1549 (emphasis added).

Applying those principles here make clear that the named Plaintiff has Article III standing.

By obtaining Mr. Harris's consumer report without first providing him proper disclosure and receiving his authorization as required by § 1681b(b)(2)(A), Exel not only caused Harris informational injury but also invaded his privacy—the very harms that specifically motivated Congress's enactment of the FCRA and that have long been recognized by the common law. It is irrelevant whether he understood that Exel would procure a consumer report or how it would be used because he was the object of a violation of the FCRA's disclosure requirements. Put simply, Harris "suffered injury in precisely the form the statute was intended to guard against, and therefore has standing." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 364 (1982). Further, by failing to provide Harris with the information required by § 1681b(b)(3)(A) before using his background report to deny him employment, Exel caused Harris to also suffer not only a privacy injury but also the very type of informational injury that the Supreme Court recognized in *Spokeo*. *See* 136 S. Ct. at 1549-50. Thus, this Court should deny Exel's motion and allow this litigation to continue accordingly.

## II.   BACKGROUND

### A.  Historical Framework: The Fair Credit Reporting Act

Congress enacted the Fair Credit Reporting Act in 1970 to protect the "consumer's right to privacy" by ensuring "the confidentiality, accuracy, relevancy, and proper utilization" of consumer credit information. 15 U.S.C. § 1681(b). And, recognizing the "vital role" that consumer reports[1] play in the modern economy, Congress sought to encourage those handling the sensitive information in those reports to "exercise their grave responsibilities" in a way that "ensure[s] fair and accurate credit reporting." 15 U.S.C. § 1681(a); *Robinson v. Equifax Info. Servs.*, LLC, 560

---

[1] Under the FCRA, "consumer reports" include "any written, oral, or other communication of any information by a consumer reporting agency…which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for--…(B) employment purposes[.]" 15 U.S.C. § 1681a(d)(B).

F.3d 235, 239 (4th Cir. 2009). The FCRA fosters these purposes through a set of interlocking requirements—including strict restrictions on the use of reports for various purposes and detailed requirements about how consumers must be informed of their rights.

A prime motivation for the FCRA was the impact of third-party data collection on the employment market and particularly on individual job seekers. When it passed the FCRA, Congress voiced a strong "concern[]" that "permit[ting] employers to obtain consumer reports pertaining to current and prospective employees…may create an improper invasion of privacy." S. Rep. No. 104-185, at 35 (1995). As one legislator explained, the FCRA's protections represented "new safeguards to protect the privacy of employees and job applicants"; the Act as a whole, he continued, was "an important step to restore employee privacy rights." 140 Cong. Rec. H9797-05 (1994) (Statement of Congressman Vento); *see also* 138 Cong. Rec. H9370-03 (1992) (Statement of Congressman Wylie) (stating that the FCRA "would limit the use of credit reports for employment purposes, while providing current and prospective employees additional rights and privacy protections").

In addition to the risk of privacy-related harm, Congress also "found that in too many instances agencies were reporting inaccurate information that was adversely affecting the ability of individuals to obtain employment"—often without consumers' knowledge. *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414 (4th Cir. 2001); *see also* S. Rep. No. 91-157, at 3-4 (1969) (describing the "inability" of consumers to discover errors). And even if consumers learned of an error, they usually had "difficulty in correcting inaccurate information" because of skewed market incentives: "a credit reporting agency earns its income from creditors or its other business customers," and "time spent with consumers going over individual reports reduces…profits." 115 Cong. Rec. 2412 (1969).

3

As a result, under the FCRA, an employer must disclose to a job seeker that "a consumer report may be obtained for employment purposes" and must obtain authorization from a consumer before procuring his or her consumer report. *See* 15 U.S.C. § 1681b(b)(2)(A). And, to ensure that prospective employees are adequately informed about their rights concerning these consumer reports, the FCRA requires that this information be provided "in a document that consists solely of the disclosure." *Id.* Absent the job seeker's informed consent or strict compliance with the statute's disclosure requirements, it is flatly illegal for a company to obtain a job applicant's consumer report for employment purposes—a point Congress hammered home by criminalizing the acquisition of a consumer report under false pretenses. *See* 15 U.S.C. § 1681q.

The FCRA also includes special requirements for when an employer plans on taking adverse action based in whole or in part on a consumer report. *See* 15 U.S.C. § 1681b(b)(3). "Specifically, before taking adverse action regarding the consumer's current or prospective employment, an employer must provide to the consumer a copy of the report and a written description of the consumer's rights under the FCRA. The employer must also provide the consumer with a reasonable period to respond to any information in the report that the consumer disputes and with written notice of the opportunity and time period to respond." H.R. Rep. No. 103-486 (1994). As the FTC has explained, this requirement is designed not only to promote accuracy, but also to educate consumers: "Congress required employers to include [a] summary of rights in the pre-adverse action disclosure along with a copy of the consumer report so that consumers would be fully informed of their rights." FTC Advisory Opinion to Attorney Hawkey, (Dec. 18, 1997), *available at* http://1.usa.gov/1NS1Cbv.[2]

---

[2] Courts may rely on FTC authoritative guidance in interpreting the FCRA. *Ramos v. Genesis Healthcare, LLC*, 141 F. Supp. 3d 341, 347 n. 4 (E.D. Pa. 2015) (citing *Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 848 F. Supp. 2d 532, 543 (E.D. Pa. 2012)).

### B. Relevant Factual Background

Harris's FCRA claims arise from his application for employment to Exel in the summer of 2013. (Doc. 1). In its motion, Exel does not challenge the operative elements of Harris's claims. After a successful application and interview process, Exel offered Harris a contingent offer of employment. (*Id.* at ¶ 9). On August 2, 2013, Exel procured Harris's consumer report from Sterling Testing Systems ("Sterling"). (Doc. 32, at p. 6). Prior to this procurement, Exel did not provide Harris with a standalone disclosure that it would obtain his consumer report for employment purposes, and thus did not acquire proper authorization from Harris as required under § 1681b(b)(2)(A). (Doc. 1).

Exel asserts, instead, that its application materials provided Harris with the requisite § 1681b(b)(2)(A) disclosures. Specifically, Exel's application states:

> I authorize investigation of all statements contained in this application, of personal history, and of my financial and credit record as may be necessary in arriving at an employment decision. I authorize you to make an ***investigative consumer report*** whereby information is obtained through personal interviews with my neighbors, friends, or others with whom I am acquainted. This inquiry may include information as to my character, general reputation, personal characteristics, and mode of living. I understand I have the right to make a written request within a reasonable period of time to receive additional, detailed information about the nature and scope of any investigative report made.

(Doc. 32, at p. 5) (emphasis added).[3] An "investigative consumer report" is not a "consumer report" under the FCRA; the two types of reports are wholly separate and distinct. *See* 15 U.S.C. § 1681a(e). An investigative consumer report "shall ***not*** include specific factual information…from a ***consumer reporting agency***." *Id.* (emphasis added). Conversely, a

---

[3] As Exel notes, there remains a factual dispute whether Harris was provided with a separate disclosure regarding the procurement of his consumer report. (Doc. 32, at p. 6 n. 5). But for purposes of Exel's motion, it is not at issue. Moreover, this purported disclosure provided to Exel by Sterling is similarly violative of § 1681b(b)(2)(A). *See e.g.*, *Jones v. Halstead Mgmt. Co., LLC*, 81 F. Supp. 3d 324, 333 (S.D.N.Y. 2015) (holding that Sterling disclosure form does not satisfy § 1681b(b)(2)(A)'s "standalone" or "solely" requirement).

"consumer report" means "any written, oral, or other communication of any information **by a consumer reporting agency**…" 15 U.S.C. § 1681a(d)(1) (emphasis added). Thus, Exel's application materials do not in any way comply with § 1681b(b)(2)(A).

After Exel obtained Harris's consumer report in violation of § 1681b(b)(2)(A), it took adverse employment action against him based on the report. (Doc. 1). But before denying Harris employment based on his consumer report, Exel did not provide him with a copy of the report or a summary of his FCRA rights. Instead, several days later, an Exel manager contacted Harris by phone and informed him that Exel had denied him employment based on derogatory information contained in his background check with vague references to a license suspension and warrants. (Harris Dep., at 163:18-22) (attached as Exhibit A). While the Exel manager provided Harris with a phone number for Sterling, he did not provide him with a copy of the derogatory consumer report or a summary of his FCRA rights in violation of § 1681b(b)(3)(A).

In light of these FCRA violations, Exel does not challenge Harris's claims on the merits. Rather, Exel seeks to avoid liability by claiming that Harris lacks standing, principally under the theory that Harris knew that it was common for employers to run background checks on applicants. As an initial matter, not all background checks are "consumer reports" requiring a standalone disclosure under § 1681b(b)(2)(A). But more importantly, Exel is not absolved of its responsibility to comply with the FCRA merely because an applicant may have been the subject of a consumer report in past occupations. The logical consequences of such a wide-ranging rule would effectively end employer liability under the FCRA.

Moreover, Exel overstates Harris's purported knowledge of the FCRA's requirements. While Harris may have known that previous employers had run "background checks" on him and may have expected that Exel might do the same, he did not *know* that Exel would obtain his

"consumer report" from Sterling. Further, while Harris testified that he had seen documents containing the Summary of FCRA rights in the past, he was not familiar their contents. (Harris Dep., at 28:9) ("I'm familiar *with seeing it*.") (Ex. A) Indeed, he did not recognize the summary of rights when presented with it. (*Id.* at 203:3-204:7) (Ex. A). More importantly, this purported knowledge is immaterial to his FCRA claims.

Likewise, Exel's focus on Harris's confusion regarding his criminal record history—and the accuracy of that information—is immaterial. As made clear from his deposition testimony, Harris is genuinely confused as to whether the 20-year old Wisconsin criminal information is related to solely to him or whether they include information belonging to an individual who assumed his identity. If Harris believed those criminal records to be accurate, why would he voluntarily risk arrest by filing a police report and litigating this action? And Harris has been employed at numerous positions without this purported criminal information appearing on any background report.

But even if correct, an applicant's criminal record information does not excuse an employer's obligations under the FCRA. It is important to note that Exel essentially concedes that it did not comply with the FCRA's disclosure and pre-adverse action requirements when obtaining Harris's consumer report and using it to deny him employment. Instead it seeks summary judgment on the claim that Harris did not suffer "concrete" harm. In doing so, Exel conflates tangible harm with Article III's injury-in-fact requirement. Article III does not require *tangible* harm—and *Spokeo* did not alter that precedent. *See Perrill v. Equifax Info. Services, LLC*, No. , 2016 WL 4572212, at *4 (W.D. Tex. Aug. 21, 2016) (recognizing that *Spokeo* does not require a plaintiff to allege actual damages to satisfy Article III standing); *see also Thomas v. FTS USA, LLC*, No. 3:13-cv-825, 2016 WL 3653878, at *11 (E.D. Va. June 30, 2016).

7

### C. ARGUMENT

**A.**     ***Spokeo* did not change the requirements for Article III standing.**

To have standing to bring a claim in federal court, the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo*, 136 S. Ct. at 1547. "To establish injury in fact, a plaintiff must show that he or she suffered an 'invasion of a legally protected interest' that is 'concrete ***and*** particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (citations omitted; emphasis added).

Exel only challenges Harris's standing on grounds that he has not suffered "concrete" injury from Exel's FCRA violations. Despite Exel's mischaracterization of the decision, however, *Spokeo* did not change the legal framework for analyzing standing nor overrule any of the relevant precedent. Instead, the Court in *Spokeo* simply reiterated that the Article III standing inquiry asks not only whether an injury is particularized, but also whether it is concrete —"that is, it must actually exist." *Id.* at 1548.

Elaborating on the meaning of concreteness, the Court in *Spokeo* distilled several "general principles" from its prior decisions, without going beyond those cases. *Id.* at 1550. First, it acknowledged that, although tangible injuries (like physical or economic harm) are "perhaps easier to recognize" as concrete injuries, "intangible injuries can nevertheless be concrete," as can injuries based on a "risk of harm." *Id.* at 1549-50. Second, "[i]n determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Id.* So if the "alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts"—or, more plainly, if "the common law permitted suit" in analogous circumstances—the plaintiff will have suffered a

concrete injury that can be redressed by a federal court. *Id.*; *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998) (explaining that Article III encompasses "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process").

A plaintiff need not dig up a common-law analogue to establish a concrete injury, because Congress has the power (and is in fact "well positioned") "to identify intangible harms that meet minimum Article III requirements," even if those harms "were previously inadequate in law." *Spokeo*, 136 S. Ct. at 1549 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992)). Accordingly, the third principle emphasized in *Spokeo* is that Congress can elevate even procedural rights to a concrete injury if they protect against an identified harm. Of course, "a bare procedural violation, divorced from any concrete harm" identified by Congress, will not give rise to an Article III injury. *Id.* at 1549. But a "person who has been accorded a procedural right to protect his concrete interests" has standing to assert that right, and may do so "without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572, n. 7.

Critically, none of these principles are new. *Thomas*, 2016 WL 3653878, at *4 ("Contrary to Defendants' position, *Spokeo* did not change the basic requirements of standing."); *and LaVigne*, 2016 WL 4196812, at *3 (citing *Krakauer v. Dish Network LLC*, 168 F. Supp. 3d 843, 844 (M.D.N.C. 2016) (recognizing that *Spokeo* "did not fundamentally change the doctrine of standing or jurisdiction.") And the Court in *Spokeo* did not even apply these principles to the facts before it, choosing instead to remand the case to the Ninth Circuit, whose previous analysis was "incomplete" because it had "overlooked" concreteness. 136 S. Ct. at 1545. The Court, in other words, offered no assessment of the Ninth Circuit's analysis below, aside from its determination that the Ninth Circuit had failed to analyze concreteness as a separate step in the injury-in-fact inquiry.

Yet Exel acts as if *Spokeo* broke new ground with repeated references to "bare procedural violations." That a "bare procedural violation, divorced from any concrete harm" is not enough to confer standing has long been the rule for Article III standing. *Spokeo*, 136 S. Ct. at 1549 (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009)). And, although it is true that, after *Spokeo*, "Article III standing requires a concrete injury even in the context of a statutory violation," that was just as true **before** *Spokeo*. *See, e.g.*, *Summers*, 555 U.S. at 497 ("[T]he requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute.").

Thus, despite Exel's efforts to exaggerate the decision's importance, *Spokeo* has done very little to change (or even clarify) the law. It instead summarizes the doctrine and provides examples of injuries that might (or might not) constitute sufficiently concrete harm. Simply put, if Exel was confident that Harris lacks standing under Article III, then it could have sought dismissal out of the gate, as the case law then is no different now.

### B. The Ninth Circuit's decision in *Syed v. M-I, LLC*, and the weight of post-*Spokeo* case law, confirms Harris's standing.

One week after Exel filed its motion, the Ninth Circuit Court of Appeals became the first appellate court to examine claims under 15 U.S.C. § 1681b(b)(2)(A) after *Spokeo*. *Syed v. M-I, LLC*, No. 14-17186, 2017 WL 242559 (9th Cir. Jan. 20, 2017). There, the court held that the district court erred in dismissing claims alleged that defendant had violated § 1681b(b)(2)(A) by including extraneous information in its disclosure. *Id.* at *1. Like here, the defendant in *Syed* claimed that plaintiff alleged only a bare procedural violation because the disclosure provided the statutorily-required notice regardless of the violative extraneous information. The Ninth Circuit held otherwise:

> Syed alleges more than a "bare procedural violation." The disclosure requirement at issue, 15 U.S.C. § 1681b(b)(2)(A)(i), creates a right to information by requiring prospective employers to inform job applicants that they intend to procure their

> consumer reports as part of the employment application process. The authorization requirement, § 1681b(b)(2)(A)(ii), creates a right to privacy by enabling applicants to withhold permission to obtain the report from the prospective employer, and a concrete injury when applicants are deprived of their ability to meaningfully authorize the credit check. By providing a private cause of action for violations of Section 1681b(b)(2)(A), Congress has recognized the harm such violations cause, thereby articulating a "chain[ ] of causation that will give rise to a case or controversy."

*Id.* at *4 (citing *Spokeo*, 136 S. Ct. at 1549). The Court further held, as a matter of law, that "in light of the clear statutory language that the disclosure document must consist 'solely' of the disclosure, a prospective employer's violation of the FCRA is 'willful' when the employer includes terms in additional to the disclosure[.]" *Id.* at *1.

The Eleventh Circuit's decision in *Church v. Accretive Health, Inc.* is similarly instructive. 654 F. App'x 990 (11th Cir. 2016). That case involved alleged violations of the Fair Debt Collection Practices Act where defendant omitted certain statutorily-mandated disclosures in a debt collection letter it sent to the plaintiff. *Id.* at 991. The plaintiff did not allege actual damages from the faulty letter, and the district court granted summary judgment to defendant concluding that the Act did not apply to the letter. *Id.* at 991-92. On appeal, the defendant raised the issue of standing shortly after *Spokeo* was handed down. *Id.* After carefully reviewing *Spokeo*, the Court decided that "[a]n injury-in-fact, as required by Article III, 'may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing….'" *Id.* at 993 (citing *Havens Realty*, 455 U.S. at 373). In concluding that Church had standing to sue, the court held that the deprivation of the statutorily-required information was an injury "that Congress has elevated to the status of a legally cognizable injury through the FDCPA." *Id.* at 995.

Notably, the *Church* opinion relied heavily on *Havens Realty*. There, the Supreme Court addressed, *inter alia*, whether a tester-plaintiff had sufficiently alleged injury-in-fact to assert a violation of the Fair Housing Act (FHA). 455 U.S. at 372-73. The tester-plaintiff alleged the

defendant falsely told her that it had no apartments available to rent, while the defendant told a white tester that it did have apartments available. *Id.* at 368. The tester-plaintiff did not intend to rent an apartment but was merely posing as a renter to collect evidence of unlawful steering practices. *Id.* Thus, the only injury alleged by the tester-plaintiff was that she was given false information in violation of the Fair Housing Act. *Id.* at 373-74.

The Court found that the FHA "establishes an enforceable right to truthful information concerning the availability of housing" and that "[a] tester who has been the object of a misrepresentation made unlawful under [the FHA] has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions." *Id.* Analogous to Exel's argument regarding Harris's alleged FCRA knowledge, the Court explained that the fact the tester never intended to rent the apartment "does not negate the simple fact of injury within the meaning of [the FHA]." *Id.* at 374. Instead, the Court held that the tester-plaintiff "alleged injury to her statutorily created right to truthful housing information" satisfying Article III's injury-in-fact requirement. *Id.*

Just as in *Church* (and *Havens Realty*), Harris had a right to receive the federally-mandated disclosures made in a specific format but did not receive them. Thus, Harris has sufficiently demonstrated that he sustained a concrete—i.e., real—injury because he did not received the requisite stand-alone disclosure document required by the FCRA. This is particularly true for Harris's claims under § 1681b(b)(3)(A) since he was deprived of both a copy of the derogatory consumer report and the FCRA summary of rights. The invasion of Harris's right to receive the disclosure and pre-adverse action notice is not hypothetical or uncertain; just as in *Church*, here Harris did not receive information to which he was entitled and in the format delineated by the statute. "While this injury may not have resulted in tangible economic or physical harm that courts

often expect, the Supreme Court has made clear an injury need not be tangible to be concrete." *Church*, 654 F. App'x at 994 (citing *Spokeo*, 136 S. Ct. at 1549).

Rather, this injury is one that Congress has elevated to the status of a legally cognizable injury through the FCRA. Accordingly, Harris has established that he suffered concrete injury, and thus, satisfies the injury-in-fact requirement. "[T]he rights created by § 1681b(b)(2) [and 1681b(b)(3)] are substantive rights, and the breach of the statute is not 'a bare procedural violation' of a technical requirement…In other words, a plaintiff in such a case need not allege any ***additional*** harm beyond the one Congress has identified." *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 637 (E.D. Va. 2016) (quoting *Spokeo*, 136 S. Ct. at 1549) (emphasis original). The Eleventh Circuit's decision in *Nicklaw v. Citimortgage, Inc.* does not alter this analysis as it involved claims under ***state*** law not a federal statute. 839 F.3d 998, 1002 (11th Cir. 2016).

And contrary to Exel's claims, the Sixth Circuit has not substantively applied *Spokeo*. In *Galaria*, plaintiffs sued defendant after its network was hacked resulting in the theft of plaintiffs' personal information. No. 15-3386/3387, 2016 WL 4728027, at *1 (6th Cir. Sept. 12, 2016). There, the dispute focused on the "actual or imminent" requirement for standing, namely whether the theft of plaintiffs' personal information created an imminent risk of harm. *Id.* at *3. It did not substantively analyze the "concrete and particularized" prong after *Spokeo*. Similarly, in *Soehnlen v. Fleet Owners Ins. Fund*, the Sixth Circuit's analysis focused not on the "concreteness" element but on the "particularized" element: "We again reiterate, Plaintiffs are not absolved of their individual obligation to satisfy the injury element of Article III just because they allege class claims. We previously made clear that potential class representatives must demonstrate 'individual standing vis-à-vis the defendant; [they] cannot acquire such standing merely by virtue of bringing

a class action.'" 844 F.3d 576, 582 (6th Cir. 2016) (citing *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998)).

Exel's other proffered case law is similarly immaterial or unpersuasive. In *Meyers v. Nicolet Restaurant of De Pere, LLC*, plaintiff alleged that defendant did not truncate his credit card expiration date as required by FACTA, a 2003 amendment to the FCRA. 843 F.3d 724, 725 (7th Cir. 2016). The Seventh Circuit held that Meyers "did not suffer any harm…nor had the violation created any appreciable risk of harm" as Meyers "discovered the violation immediately and nobody else saw the non-compliant receipt." *Id.* at 727. Similarly, in *Braitberg v. Charter Commc'ns, Inc.*, plaintiff alleged only that defendant had improperly retained personal information. 836 F.3d 925, 930 (8th Cir. 2016). Plaintiff did not allege that defendant had disclosed the information to a third party or that any outside party had accessed the data, thus there was no material risk of harm. *Id.* These cases are distinguishable from Harris's claim because Exel's unauthorized procurement of his consumer report constitutes the harm. *See Thomas*, 193 F. Supp. 3d at 636.

The weight of authority at the district court level also confirm that Harris has established Article III standing. Under the FCRA, individuals like Harris "have the right to specific information at specific times"—and where that consumer "receive[s] a type of information, [but] not the type of information that he is entitled to under the FCRA," he has suffered an "informational injury." 123 F. Supp. 3d 810, 818 (E.D. Va. 2015); *see also Panzer v. Swiftships, LLC*, No. 15-2257, 2015 WL 6442565, at *5 (E.D. La. Oct. 23, 2015) ("Under the FCRA, Plaintiff and other consumers have the right to specific information at specific times…The allegation that Defendant failed to provide that information is sufficient to show 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent.'") (citing *Lujan*,

504 U.S. at 560); *and Ryals v. Strategic Solutions, Inc.*, 117 F. Supp. 3d 746, 753 (E.D. Va. 2015) (finding standing where, like here, the plaintiff alleged "that he did not receive the required information at the required time, as required by the FCRA.").

More recently, in perhaps the most analytically thorough (and well-cited) of the post-*Spokeo* decisions, the District Court for the Eastern District of Virginia in *Thomas* considered comparable claims under §§ 1681b(b)(2)(A) and 1681b(b)(3)(A). 193 F. Supp. 3d at 625. After a lengthy discussion, the *Thomas* court recognized that the plaintiff alleged two concrete injuries: an "informational injury" and a violation of his right to privacy. *Id.* at 634-37. In support of plaintiff's informational injury, the *Thomas* court relied on *Federal Election Comm'n v. Akins*, 524 U.S. 11 (1998) and *Pub. Citizen v. Dept. of Justice*, 491 U.S. 440 (1989), two cases specifically identified by the Supreme Court in *Spokeo*. *Id.* at 635; *see also Spokeo*, 136 S. Ct. at 1549-50. Both *Akins* and *Public Citizen* "teach that Congress may create a legally cognizable right to specific information, the deprivation of which constitutes a concrete injury under Article III". *Id.* "Therefore, where a consumer alleges, as Thomas does here, that he or she has received a disclosure that does not satisfy [§ 1681b(b)(2)(A)], the consumer has alleged a concrete informational injury." *Id.*

In other words, Exel's violation was not "procedural" or "technical". Rather, Exel denied Harris information to which he was specifically entitled under the FCRA ***in the form*** that Congress has already determined to be substantively important, and he has suffered a clear informational injury. *See, e.g.*, *Graham v. Pyramid Healthcare Solutions*, No. 8:16-cv-1324, 2016 WL 6248309, at *2 (M.D. Fla. Oct. 26, 2016); *Hargrett v. Amazon.com DEDC LLC*, No. 8:15-cv-2456, 2017 WL 416427, at *4 (M.D. Fla. Jan. 30, 2017); *Mix v. Asurion Ins. Services, Inc.*, No. 14-cv-02357, 2016 WL 7229140, at *6 (D. Az. Dec. 14, 2016). This is particularly true as to Harris's claims

under § 1681b(b)(3)(A) given that he was not provided with a copy of the consumer report and thereby denied access to the specific information that was used by Exel to deny him employment.

Moreover, without providing the proper disclosures and notices, Exel never obtained proper authorization from Harris to procure his consumer report, constituting an invasion of privacy. As the *Thomas* court explained in an identical claim under § 1681b(b)(2) and 1681b(b)(3), regardless of consent, "where a defendant fails to comply with statutory prerequisites protecting plaintiff's privacy, the plaintiff's privacy has been unlawfully invaded and he has suffered concrete injury." 193 F. Supp. 3d at 636. Accessing private information without a legal basis to do so is a classic example of a modern-day analogue to well-recognized common law torts. *See Intrusion Upon Seclusion, Restatement (Second) of Torts* § 652B (1977) ("One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy…"); *Snakenberg v. Hartford Cas. Ins. Co.*, 383 S.E.2d 2, 5 (S.C. Ct. App. 1989) ("The law recognizes that each person has an interest in keeping certain facets of personal life from exposure to others. This interest in "privacy" is a distinct aspect of human dignity and moral autonomy.")

It bears noting (once again), that Congress specifically intended to safeguard against these types of informational and privacy injuries. With the FCRA, Congress sought to address employers' "increasing reliance on consumer reporting agencies to obtain information" about their prospective and current employees. *Dalton*, 257 F.3d at 414 (citing 116 Cong. Rec. 36570 (1970)). In particular, it was concerned that employers would use such information to "adversely affect[]" employees, who lacked any resources to correct or even become of aware of the consumer information. *Id.* Thus, it enacted the FCRA and required that it be liberally construed in favor of the consumer. *See Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 964 (6th Cir. 1998)

(noting that the Court must be "guided by the fact that the FCRA is to be liberally construed in favor of the consumer[.]") As made clear by *Spokeo*, "because Congress is well positioned to identify intangible harms that meet minimum Article III requirements," its "judgment" is both "instructive and important." 136 S. Ct. at 1549. This Court should respect Congress's considered judgment and conclude that Harris (and, by extension, all putative class members he seeks to represent) has standing on his §§ 1681b(b)(2)(A) and 1681b(b)(3)(A) claims.

Indeed, adopting any conclusion other than that Harris has standing would have far-reaching implications, not only for the FCRA, but for numerous other statutes that seek to protect consumers by requiring disclosures and allow the recovery of statutory damages for failure to comply. The Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, (TILA) and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.*, (RESPA) are only two consumer-protection statutes that would be gutted if *Spokeo* were misinterpreted as undermining standing based on informational injury. *See e.g.*, 15 U.S.C. § 1638 (requiring disclosures under TILA); 15 U.S.C. § 1640(a)(2)(B) (allowing for statutory damages for failure to comply with TILA); 12 U.S.C. § 2605(c) (requiring disclosures under RESPA in certain circumstances); 12 U.S.C. § 2605(f)(1)(B) (allowing recovery of statutory damages for noncompliance with RESPA). If consumers are no longer permitted to seek redress when defendants fail to comply with statutorily mandated disclosure requirements, the failure to comply with those requirements, and the attendant abuses, will not be far behind.

## IV. CONCLUSION

Based on the foregoing, Harris has established standing under Article III, and Exel's motion for summary judgment should be denied.

17

Respectfully submitted,

O'TOOLE, McLAUGHLIN, DOOLEY &
PECORA CO., LPA

/s/ Matthew A. Dooley
Matthew A. Dooley     (0081482)
Anthony R. Pecora      (0069660)
Stephen M. Bosak, Jr. (0092443)
5455 Detroit Road
Sheffield Village, Ohio  44054
Tel:            (440) 930-4001
Fax:            (440) 934-7208
Email:          mdooley@omdplaw.com
                apecora@omdplaw.com
                sbosak@omdplaw.com

*Counsel for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2017, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which shall send electronic notification of this filing to all counsel/parties of record.

/s/ Matthew A. Dooley
Matthew A. Dooley
*Counsel for Plaintiff and putative class*